UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 07-60738-CIV-ALTONAGA/Brown

CHABAD OF NOVA, INC.,

      Plaintiff,

vs.

CITY OF COOPER CITY,

      Defendant.

_____/

## ORDER ON SUMMARY JUDGMENT MOTIONS

**THIS CAUSE** is before the Court upon Plaintiff, Chabad of Nova, Inc.'s ("Chabad['s]")
Motion for Partial Summary Judgment ("Chabad Mot.") [D.E. 79] and Defendant, City of Cooper
City's (the "City['s]") Amended Motion for Partial Summary Judgment ("City Mot.") [D.E. 75], both
filed on June 13, 2008.  Chabad moves for a summary judgment finding the City liable on Chabad's
claims pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 (the
"RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.* (Counts I and II), and the Fourteenth Amendment Equal
Protection Clause (Counts VI and VII).  The City, in turn, moves for summary judgment in its favor
on Counts I, II, VI, and VII, and also on Counts VIII, IX, XI and X, which variously challenge the
City's zoning ordinances based on 42 U.S.C. § 1983 single-act liability, and the Free Exercise and
the Free Speech Clauses of the First Amendment.  The Court has carefully considered the parties'
written and oral submissions,[1] the record, and applicable law.

_____

[1] Oral argument was held on July 21, 2008.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

# I.  <u>BACKGROUND</u>[2]

## A.   Introduction

Plaintiff, Chabad, is a Jewish Orthodox Chabad Outreach Center and a non-profit Florida corporation.  (*See* Amended Complaint ("Am. Compl.") [D.E. 32] ¶¶ 8, 23).  Plaintiff is part of the Chabad movement, a particular philosophy/denomination within Orthodox Judaism that emphasizes certain mystical teachings, as well as outreach and education in the Jewish World.  *See Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1320 n.2 (11th Cir. 2005) (citing Arthur Green & Shaul Magid, *Hasidism: Habad Hasidism, in* ENCYCLOPEDIA OF RELIGION (Lindsay Jones ed., 2d ed. 2005)).

Defendant, Cooper City, is a municipal corporation created by Special Act of the Florida Legislature on June 20, 1959.  *See* City of Cooper City Website, *History of Cooper City, Florida* (Aug. 28, 2007), *at* http://www.coopercityfl.org.  Cooper City encompasses approximately 6.7 square miles in Broward County, Florida, and has a population of approximately 30,000 people.  (*See* App. to City Mot., Ex. 18, Aff. of Matt Wood ¶ 4 [D.E. 78-26]).  The City is empowered to regulate the use of land and structures within the City's borders, consistent with the law.  (*See* Am. Compl. ¶ 9; Answer to Am. Compl. ("Answer") [D.E. 33] ¶ 9).

## B.   Cooper City's Land Use Code Pre-October 2006

The Cooper City Code of Ordinances (the "COO") defines "church or place of worship" as "any structure or site such as a church, synagogue, chapel, sanctuary or cathedral, used for the collective or individual involvement with a religious activity, such as rites, rituals, ceremonies, prayers, and discussions, and further customary accessory uses on the same site, such as parochial

---

[2]  Unless otherwise noted, the facts set forth in this section are undisputed.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

schools and day care centers." COO § 21-8 [D.E. 81-5]. Prior to October 2006, the COO did not include religious worship as a permitted use in the Planned Neighborhood Business District (the "B-1 District"), the Planned Community Center District (the "B-2 District"), the General Business District (the "B-3 District") (collectively, the "Business District"), the Office Park District (the "OP District"), or the Park and Recreational District (the "P-1 District"). (*See* COO §§ 23-46, 23-48, 23-50 [D.E. 81-6]; Am. Compl., Ex. E, Ordinance No. 2006-10-2 [D.E. 32-6] at 2; Ex. F, Ordinance No. 2006-10-3 [D.E. 32-7] at 2).

The COO, however, permitted other non-religious assembly use in the OP and P-1 Districts, including community assemblies.[3] (*See* Ordinance No. 2006-10-2 at 2; Ordinance No. 2006-10-3 at 2). Pursuant to the text of the COO, the B-1 Districts were intended "to provide for the local neighborhood shopping and personal service needs of a limited surrounding residential area." COO § 23-46(a). Day care centers were permitted in all of the Business Districts. *See* COO §§ 23-46, 23-48, 23-50. "Personal improvement services" were also permitted in all of the Business Districts. *See id.* "Personal improvement services" were defined as establishments "primarily engaged in the provision of informational, instructional, personal improvement and similar services of a nonprofessional nature," including aerobic studios, martial arts studios, art, music, dancing, and drama schools, and handicraft or hobby instruction. COO § 21-8. "Recreation, indoor" was a use permitted in the B-2 and B-3 Districts. *See* COO §§ 23-48, 23-50. "Recreation, indoor" was defined as an "establishment offering exercise, entertainment or games of skill to the general public," including movies theaters.

---

[3] The COO § 21-8 defines "community assembly" as "[a]n establishment providing meeting, recreational, or social facilities for a private or non-profit association, primarily for use by members and guests," typically including "lodges, meeting halls, and recreation centers and areas operated by private social clubs and fraternal organizations."

CASE NO. 07-60738-CIV-ALTONAGA/Brown

While the COO permitted religious assembly in the E-1, E-2, R-1-A, R-1-B, R-1-C, and R-1-D Districts (the "Residential Districts"), such use required 300 feet of main road frontage, while buildings with other uses in the Residential Districts needed only 200 feet of main road frontage. COO § 23-93. Further, the COO required 1,000 feet of separation between buildings of a non-residential or agricultural nature, including religious assemblies, located in the A-1 District (the "Agricultural District") exclusively. *See* COO § 23-118 [D.E. 81-7].[4] Variances are available when "owing to conditions peculiar to the property and not the result of the actions of the applicant," enforcement would result in "unnecessary and undue hardship." COO § 23-153(a). However, a variance is not permitted to establish a use "otherwise prohibited" in the particular zoning district. COO § 23-153(b).

## C.    Chabad Attempts to Locate in a Business District

On July 5, 2005, Rabbi Shmuel Posner ("Rabbi Posner"), on behalf of Chabad, entered into a lease for commercial space located at 8608 Griffin Road in Cooper City ("the Property"). (*See* App. to City Mot., Ex. 14, Chabad of Nova Lease for 8608 Griffin Road [D.E. 78-17, 78-18]). The property was a store front in a shopping center known as Timberlake Plaza. (*See id.*) Rabbi Posner intended to operate a Jewish Orthodox Chabad Outreach Center to serve the students at Nova University, Florida Atlantic University, and Broward Community College. (*See* App. to City Mot., Ex. 16, Depo. of Rabbi Shmuel Posner ("Posner Depo.") [D.E. 78-23] at 74-75). Soon after Chabad entered into the lease, however, the City notified Rabbi Posner that Chabad could not operate a place

---

[4] Specifically, COO § 23-118(b)(1) placed the additional restriction upon the Agricultural District of "a minimum distance of one thousand (1,000) feet between all plots upon which a development order has been issued for construction or erection of a permitted or conditionally permitted non-residential and/or non-agricultural use, or upon which a building or structure has been constructed for and is used primarily for a permitted or conditionally permitted non-residential and/or non-agricultural use."

of worship at the Property because the COO prohibited religious assembly in the B-1 Districts. (*See id.* at 62-63; Am. Compl. ¶ 27; Answer ¶ 27).

In October 2005, Rabbi Posner and counsel for Chabad met with Cooper City officials. (*See* Am. Compl. ¶ 28; Answer ¶ 28). The City agreed to permit Chabad to operate its Outreach Center on the Property during the 2005 High Holidays, but the City required Chabad to close the Outreach Center immediately thereafter. (*See* Am. Compl. ¶ 31; Answer ¶ 31; Posner Depo. at 63). Rabbi Posner and his attorneys again met with City officials on September 13, 2006 to discuss Chabad's concerns with respect to the COO. (*See* Am. Compl. ¶ 33; Answer ¶ 33).

**D.    Cooper City Alters Its Land Use Code in October 2006**

In October 2006, the City amended the COO by adopting three ordinances (the "October 2006 Amendments"). (*See* Ordinance No. 2006-10-2; Ordinance No. 2006-10-3; Am. Compl., Ex. G., Ordinance No. 2006-10-4 [D.E. 32-8]). Ordinance Numbers 2006-10-2 and 2006-10-3 amended sections 23-44(c) and 23-58(c) of the COO respectively, to permit churches and/or other places of worship in both the OP and P-1 Districts, in addition to non-religious community assemblies. Moreover, Ordinance Number 2006-10-4 repealed section 23-93 of the COO in its entirety and amended section 23-95 so places of worship located in the Residential Districts need only possess 200 feet of main street frontage, instead of the previous 300-foot requirement. Pursuant to this ordinance, places of worship are further subject to a requirement that they be located in a lot of at least 40,000 square feet in the Residential Districts. (*See* Ordinance Number 2006-10-4 ). The new frontage and lot size requirements are identical to those which are imposed upon non-religious community assemblies in the Residential Districts.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

**E.      Chabad's Claims Against Cooper City**

On October 29, 2007, Chabad filed its eleven-count Amended Complaint against Cooper City. In Counts I and II, Chabad claims the restrictions placed upon religious assemblies by the COO, both before and after the October 2006 Amendments, unreasonably limit religious assemblies in violation of section (b)(3) of the RLUIPA.  (*See* Am. Compl. ¶¶ 47-78).  Specifically, Chabad alleges, *inter alia*, the following portions of the COO were and are unreasonable limitations placed upon religious assemblies: (1) the outright ban of religious assemblies in the Business Districts; (2) the pre-October 2006 ban of religious assemblies in the OP and P-1 Districts; (3) the pre-October 2006 requirement that religious assemblies maintain 300 feet of main road frontage; (4) the post-October 2006 requirement that religious assemblies maintain 200 feet of main road frontage and a minimum lot size of 40,000 square feet; and (5) the requirement that religious assemblies maintain 1,000 feet of separation from one another in the Agricultural Districts.  (*See id.*).

Counts III and IV state claims for violations of section (b)(1) of the RLUIPA, which prohibits government from imposing land use regulations in a manner that treats religious assemblies on less than equal terms with non-religious assemblies.  In Count III, Chabad claims that, on its face, the COO violates section (b)(1) of the RLUIPA and places religious assemblies on unequal terms with non-religious assemblies because the COO permits day care centers, movie theaters, and various schools to operate in the Business Districts, but bans the operation of religious assemblies.  (*See id.* ¶¶ 79-99).  The undersigned has already granted judgment in favor of Chabad as to Count III.  (*See* Jan. 16, 2008 Order [D.E. 43]).  In addition, in Count IV, Chabad claims that, as-applied, the COO's restrictions upon religious assemblies in the Business Districts violate section (b)(1) of the RLUIPA, given that non-religious assemblies such as coffeehouses and college preparatory centers are

6

CASE NO. 07-60738-CIV-ALTONAGA/Brown

permitted to operate within the Business Districts.  (*See id.* ¶¶ 100-128).

In Count V, Chabad alleges the COO's prohibition of religious assemblies in the Business Districts violates section (b)(2) of the RLUIPA, which bans governments from implementing any land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.  (*See id.* ¶¶ 129-134).  Chabad has agreed to voluntarily dismiss this claim without prejudice.  (*See* Chabad of Nova, Inc.'s Response to Def.'s Am. Mot. for Partial Summ. J. ("Chabad Resp.") [D.E. 88] at 7).

Count VI states a claim under 42 U.S.C. § 1983, that the COO's prohibition of religious assemblies in the Business Districts, on its face, violates the Equal Protection Clause of the Fourteenth Amendment.  (*See id.* ¶¶ 135-145).  The section 1983 claim in Count VII of the Amended Complaint asserts the COO's restrictions upon religious assemblies in the Business Districts, as-applied, violate the Equal Protection Clause of the Fourteenth Amendment.  (*See id.* ¶¶ 146-163).  Count VIII, entitled "Municipal liability for city policy," is discussed in more detail *infra*.  (*See id.* ¶¶ 164-173).

Count IX states a claim under section 1983 that the COO's prohibition of religious assemblies in the Business Districts, on its face, violates Chabad's First Amendment rights to freedom of speech and freedom of assembly.  (*See id.* ¶¶ 174-180).  Count X states a claim under section 1983 that the COO's prohibition of religious assemblies in the Business Districts, its pre-October 2006 exclusion of religious assemblies from the OP and P-1 Districts, and various limitations placed upon religious assemblies located in the Residential and Agricultural Districts, violate Chabad's First Amendment right to free exercise of religion.  (*See id.* ¶¶ 181-95).

Lastly, Count XI, entitled "First Amendment - Hybrid Rights Claim," is discussed in more

CASE NO. 07-60738-CIV-ALTONAGA/Brown

detail *infra*.  (*See id.* ¶¶ 196-202).

## II.  LEGAL STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *Un. of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.  Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  However, "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

"For factual issues to be considered genuine, they must have a real basis in the record . . . .

8

CASE NO. 07-60738-CIV-ALTONAGA/Brown

[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### III. ANALYSIS

#### A.    Justiciability

As an initial matter, the Court addresses the question of justiciability with respect to Counts I, II, and X, which are newly pled in the Amended Complaint. Article III of the Constitution requires an actual case or controversy to support the exercise of federal judicial power. *See* U.S. Const. art. III, § 2; *see also, Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223 (11th Cir. 2004). The "case-and-controversy" requirement "helps to 'identify those disputes which are appropriately resolved through judicial process.'" *Ga. State Conference of NAACP Branches v. Cox*, 183 F.3d 1259, 1262 (11th Cir. 1999) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "Three strands of justiciability doctrine – standing, ripeness, and mootness – play an important role in the determination of whether the plaintiff['s] case against the [defendant] presents an Article III case or

9

CASE NO. 07-60738-CIV-ALTONAGA/Brown

controversy." *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998). Only one strand of the justiciability doctrine  –  standing  –  is at issue here.[5]

1.      *Standing – Legal Standard*

The RLUIPA provides that

> [a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under Article III of the Constitution.

42 U.S.C. § 2000cc-2(a).

"The most significant doctrine of case-or-controversy is the requirement of standing." *Midrash Sephardi*, 366 F.3d at 1223 (citation omitted). For a party to have standing to invoke federal jurisdiction it must demonstrate: (1) an injury in fact or an invasion of a legally protected interest; (2) a direct causal relationship between the injury and the challenged action; and (3) a likelihood of redressability. *See id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (11th Cir. 2001)). The threshold question is whether the plaintiff has directly "'suffered some threatened or actual injury resulting from the putatively illegal action' to warrant invocation of federal court jurisdiction.'" *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 430 F. Supp. 2d 1296, 1310 (S.D. Fla. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

"[T]o establish an injury in fact, [a plaintiff] must first demonstrate that the [defendant] has

---

[5] Although the City raised questions of mootness with respect to pending amendments to the COO (*see* Mem. of Law in Support of City Mot. ("City Mem.") [D.E. 77] at 7-9), the amendments had not been approved as of the filing of the City's Motion, and the issue was therefore not ripe. The City has filed a notice with the Court that certain amendments to the COO have now been approved (*see* Notice of Filing Community Assembly Land Development Regulations [D.E. 115]). However, the City's mootness argument goes only to the relief requested by Chabad. As the instant motions request summary judgment as to liability only, the Court does not address the issue of relief at this time.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

invaded some 'legally protected interest' of his." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1304 (11th Cir. 2006) (citation and quotations omitted). In the context of standing, an injury "requires infringement of an interest . . . protected by statute or otherwise." *Id.* (citation and quotations omitted). Such an interest consists of "obtaining compensation for, or preventing, the violation of a legally protected right." *Id.* (citation and quotations omitted).

Moreover, a "'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 955 (1984) (quoting *Warth*, 422 U.S. at 499).

2.      *Chabad has Standing to Raise its Claims Made in Counts I and II*

Chabad has standing to raise challenges to the COO that pertain to the City's Business Districts. (*See* Oct. 15, 2007 Order [D.E. 29] at 10-11). Chabad also has standing to raise the claims made in Counts I and II which challenge the entirety of the COO as an "unreasonable limitation" on religious assembly pursuant to section 2(b)(3) of the RLUIPA. Chabad challenges the City's zoning code, both prior to and subsequent to the October 2006 Amendments, alleging it "constituted an unreasonable limitation on religious assembly within the City" with respect to the ability of a religious assembly to rent property within Cooper City. (Am. Compl. ¶¶ 64, 65). Chabad makes the same allegation with respect to the ability of a religious assembly to purchase property within the City. (*See id.* ¶ 78).

Although these claims are newly presented in the Amended Complaint, taken together, they

CASE NO. 07-60738-CIV-ALTONAGA/Brown

are analogous to Count I in Chabad's original Complaint[6] (*see* Compl. [D.E. 1] ¶¶ 40-53), a claim the Court already determined Chabad had standing to raise. (*See* Oct. 15, 2007 Order at 11 n.4). As with Count I of the original Complaint, Chabad alleges all of the City's ordinances, including those that apply to the Business Districts, act to unreasonably limit religious assemblies in the City. Chabad's alleged injury in fact is clear − it cannot hold religious services in Cooper City. Moreover, the City ordinances are the cause of Chabad's injury, and a ruling in favor of Chabad would redress that injury because Chabad could then open its Outreach Center.[7] Although Chabad did not seek to locate in each of the other zoning districts in the City, this was not dispositive at the motion to dismiss stage, and no new facts have been presented which would cause the undersigned to deviate from the earlier conclusion.

3.      *Chabad Lacks Standing to Raise Claims Made in Count X*

In Count X, Chabad makes two pertinent claims pursuant to the Free Exercise Clause of the First Amendment. First, Chabad alleges the "City's zoning scheme imposes a substantial burden on Chabad's . . . rights to free exercise of religion under the First Amendment, since it is a near impossibility for new religious assembly to establish within the City." (Am. Compl. ¶ 193). Second, Chabad alleges the "prohibition of religious assemblies within the business districts constitutes a violation of Chabad's . . . First Amendment rights of free exercise." (*Id.* ¶ 195).

The undersigned finds, *sua sponte*, that Chabad does not have standing to raise the first claim.

_____

[6] Chabad was ordered to refine its allegations in Count I of the original Complaint for reasons unrelated to standing. (*See* Oct. 15, 2007 Order at 25 n.12). Counts I and II of the Amended Complaint appear to be the result of this instruction.

[7]   The location of Chabad's Outreach Center in Cooper City is limited by the requirement that Rabbi Posner be physically able to walk to the premises on weekends. (*See* App. to Chabad Mot., Ex. 13, Posner Depo. [81-14] at 68, 82).

CASE NO. 07-60738-CIV-ALTONAGA/Brown

The Eleventh Circuit has explained that section (b)(1) of the RLUIPA, the Equal Terms Provision, is a direct codification of the Supreme Court's line of precedent with respect to the Free Exercise Clause of the First Amendment. *See Midrash Sephardi*, 366 F.3d at 1232. The Court has already determined that Chabad does not have standing to raise a claim pursuant to the Equal Terms Provision with respect to any zoning districts other than the Business Districts. (*See* Oct. 15, 2007 Order at 11-13). The same reasoning applies here. Therefore, while Chabad may challenge the City's exclusion of religious assembly from the Business Districts pursuant to the Free Exercise Clause, it does not have standing to challenge any of the other zoning districts, and the Court's evaluation of Count X, *infra.*, will be so limited.

**B.      Chabad's Claims Pursuant to Section (b)(3) of the RLUIPA**

Under Section 2(b)(3) of the RLUIPA (the "Exclusion Provision"), "[n]o government shall impose or implement a land use regulation that . . . (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." The legislative history of the RLUIPA evidences that "'[w]hat is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations.'" *Vision Church, Un. Methodist v. Village of Long Grove*, 468 F.3d 975, 990 (7th Cir. 2006) (quoting 146 Cong. Rec. E1563 (daily ed. Sept. 22, 2000) (statement of Rep. Canady)). In determining reasonableness, Chabad proposes that the Court evaluate whether the number of sites available under the zoning scheme provides a reasonable opportunity for religious expression, a method employed in the context of free expression challenges to zoning ordinances. *See Univ. Books & Videos, Inc. v. Miami-Dade County, Fla.*, 132 F. Supp. 2d 1008, 1013 (S.D. Fla. 2001) (evaluating whether zoning ordinance leaves open reasonable alternative avenues of expression for adult establishments); *Fly Fish, Inc. v. City of Cocoa Beach*,

13

CASE NO. 07-60738-CIV-ALTONAGA/Brown

337 F.3d 1301, 1309 (11th Cir. 2003) (same).  While "[t]he calculation of the number of sites is a question of fact," reasonableness is a question of law.  *Univ. Books*, 132 F. Supp. 2d at 1013.  The City has not contested this type of analysis, and it is consistent with the analysis proposed by Congress, as evidenced by the legislative history.  The parties conceded at oral argument that there are no open questions of fact with respect to these counts.  Therefore, the Court will evaluate the reasonableness of the COO based upon the record before it.

In Count I, Chabad alleges the City's zoning code constitutes an unreasonable limitation on the ability of religious assemblies to *rent* space within Cooper City.  (*See* Am. Compl. ¶¶ 64, 65).  In Count II, Chabad alleges the City's zoning code constitutes an unreasonable limitation on the ability of religious assemblies to *purchase* property within Cooper City.  (*See id.* ¶¶ 66-78).  The Court interprets Counts I and II to each include two separate claims pursuant to subsection B of the Exclusion Provision:  (1) an as-applied challenge to the pre-October 2006 COO, and (2) an as-applied challenge to the current COO.

### 1.    As-Applied Challenge to Pre-October 2006 COO

Prior to the October 2006 Amendments, the City prohibited religious assemblies from locating in the Business Districts, the OP Districts, and the P-1 Districts.  Community assemblies, by contrast, were permitted to locate in the latter two districts.  Religious assemblies were only permitted to locate in either the Residential Districts or the Agricultural Districts.  Religious assemblies that located in either of these districts were subject to additional zoning requirements: (1) religious assemblies were required to maintain 300 feet of main road frontage (compared to 200 feet required of community assemblies) in the Residential Districts; and (2) religious assemblies were required to maintain a minimum of 1,000 feet of distance from any other non-residential or non-agricultural use

14

CASE NO. 07-60738-CIV-ALTONAGA/Brown

in the Agricultural Districts.

With respect to Count I, other than a citation to the zoning restriction in the Business Districts, Chabad fails to submit any evidence regarding the availability of rental properties in either the Residential or Agricultural Districts. A conclusory statement that residential property could likely not be rented because of "build-out requirements" (*see* Chabad Mot. at 10), without evidence does not support summary judgment as to this claim.

With respect to Count II, Chabad presents evidence that the average frontage of residential properties within the City is 60 feet (*see* App. to Chabad Mot., Ex. 16, Depo. of Matt Wood ("Wood Depo.") [D.E. 81-17] at 66), which means that an average of five properties would need to be aggregated to meet the frontage requirement in the Residential Districts.[8]  Chabad submitted extensive evidence regarding the cost necessarily incurred by religious assemblies that would wish to locate in the Residential Districts, including the range of prices required to meet the frontage requirement with anywhere from 2-7 adjacent properties. (*See* Chabad Mot. at 8-9).  In 2005, the additional cost that would have been incurred by a religious assembly to purchase more than one property ranged from approximately $600,000 to over $2 million. (*See id.*).  In 2006, the additional cost incurred by a religious assembly ranged from $880,000 to over $2.5 million.  (*See id.*).

While it is true that religious assemblies cannot complain when they are subject to the same marketplace for property as are all land users, *Midrash Sephardi*, 366 F.3d at 1227 n.11, religious

---

[8]  The City's argument that the various frontage and separation requirements would have been subject to variance under COO § 223-153 fails to persuade.  Pursuant to the language of the ordinance, a variance is only available when, "owing to the conditions peculiar to the property and not the result of the actions of the applicant, a literal enforcement of the ordinance would result in unnecessary and undue hardship."  *Id.*  The City has not offered any evidence that the mere desire to avoid the additional cost required to satisfy zoning requirements qualifies as a condition "peculiar to the property."  Neither the plain language of the ordinance nor any other evidence presented supports a finding that Chabad would have reason to believe a variance was an available option.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

assemblies are not participating in the same marketplace when they are required to aggregate anywhere from 2-7 times the number of properties as the average land user and required to obtain more frontage than any other non-residential uses in the same district.  And while Chabad offered minimal evidence of the limited availability of properties in the Agricultural Districts (*see* Chabad Mot. at 10), the City has not challenged this evidence.  The factual record demonstrates there was limited availability of property for the location of religious assemblies, religious assemblies were subject to inflated costs in order to locate in the City, and religious assemblies were subject to more stringent requirements than other similar uses.  Consequently, the pre-October 2006 COO imposed unreasonable limitations upon religious assembly in violation of section (b)(3)(B) of the RLUIPA.

> 2.      *As-Applied Challenge to the Post-October 2006 COO*

The October 2006 Amendments modified the COO to permit religious assemblies to locate in the OP and P-1 Districts without restriction.  The frontage requirement in the Residential Districts was modified so that religious assemblies need only aggregate 200 feet of main road frontage. However, religious assemblies are subject to the additional restriction of maintaining a lot size of at least 40,000 square feet.  Religious assemblies and community assemblies are thus subject to the same restrictions in the Residential Districts.[9]  Religious assemblies are still prohibited from locating in the Business Districts and are still subject to the 1,000 foot separation requirement in the Agricultural Districts.

With respect to Count I, Chabad has again failed to provide any evidence regarding the

---

[9]  The City relies on *Primera*, 450 F.3d 1295, to argue that because "community assembly," as defined by the COO was subjected to the same or similar restrictions as religious assembly, no RLUIPA violation can be found.  However, *Primera* was concerned with an alleged violation of RLUIPA § 2(b)(1), the Equal Terms Provision, which requires the comparative evaluation of religious and non-religious assemblies.  Such a comparison is irrelevant to determining whether religious assembly is unreasonably limited pursuant to section 2(b)(3)(B).

CASE NO. 07-60738-CIV-ALTONAGA/Brown

availability of rental properties in any district. The Court is unable to evaluate the marketplace without a factual record and Chabad is not entitled to summary judgment on this claim.

With respect to Count II, the City contends approximately 85% of its property is currently zoned to permit religious assemblies to locate there and 19 places of worship currently exist in the City. (*See* City Mem. at 4; City of Cooper City's Response to Plaintiff's Mot. for Partial Summ. J. ("City Resp.") [D.E. 94] at 9). However, the frontage specifications in the Residential Districts still require religious assemblies to aggregate an average of 3-4 properties. Religious assemblies are therefore subject to approximately $500,000 to $1.4 million in additional costs to locate in the Residential Districts. Further, Chabad provided evidence regarding the lack of available properties in the Agricultural Districts (*see* Chabad Mot. at 10), and the OP and P-1 Districts, which religious assemblies are permitted to enter post-October 2006. (*See* Reply in Support of Chabad Mot. [D.E. 109] at 7).

It appears from the record that the only properties available to religious assemblies are in the Residential Districts, and at great expense. The City did not challenge these assertions with any figures demonstrating availability. Further, the number of existing religious assemblies in the City is not evidence regarding the availability of reasonable opportunities for the entry of *new* religious assemblies under the current zoning ordinances. Even after the October 2006 Amendments, the City continues to provide inadequate opportunity for new religious assemblies to locate by imposing unreasonable restrictions on their purchase of property. Chabad is therefore entitled to summary judgment with respect to Count II.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

**C.      Chabad's Claims Pursuant to 42 U.S.C. § 1983**

Counts VI, VII, VIII, IX, X, and XI of Chabad's Amended Complaint include claims pursuant to 42 U.S.C. § 1983.  Section 1983 provides a cause of action for "person[s] within the jurisdiction" who have been "depriv[ed] of any rights, privileges, or immunities secured by the constitution and laws" of the United States by a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State."  42 U.S.C. § 1983.

*1.      The Equal Protection Clause*

Counts VI and VII allege the COO, on its face and as-applied, violates Chabad's right[10] to "equal protection of the laws" provided by the Fourteenth Amendment to the Constitution (the "Equal Protection Clause").  U.S. CONST. amend. XIV § 1.  The Equal Protection Clause requires local governments to treat similarly situated people alike.  *See Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006).  However, "[t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."  *Romer v. Evans*, 517 U.S. 620, 632 (1996).  The preliminary step in any equal protection analysis is to determine whether persons who are similarly situated are subject to disparate treatment by the statute or ordinance.  *See Campbell*, 434 F.3d at 1313; *Johnson v. Smith*, 696 F.2d 1334, 1336 (11th Cir. 1983).  If the group to which the plaintiff belongs is not similarly situated, no equal protection problem is presented.  *See Campbell*, 434 F.3d at 1314 (noting that "different treatment of dissimilarly situated persons does not violate the equal protection clause") (quotations and citations

---

[10] Corporations have standing to raise claims pursuant to section 1983 based upon the right of equal protection enunciated in the Fourteenth Amendment to the Constitution.  *See Primera*, 450 F.3d at 1305.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

omitted).

In a facial challenge, if the parties are similarly situated the statute or ordinance must then be scrutinized in a manner depending on the classifications the statute or ordinance implicate. The Supreme Court has established the following standards for determining the validity of ordinances under the Equal Protection Clause:

> [u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.

*City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). Where, however, an ordinance disadvantages a constitutionally suspect class, the classification may be upheld only where it is "precisely tailored to serve a compelling government interest." *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982). Similarly, in order to prevail on an equal protection claim based upon the application of a facially neutral statute, a plaintiff must establish that "(1) the plaintiff was treated differently from similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) (citing *E & T Realty v. Strickland*, 830 F.2d 1107, 1109-10 (11th Cir. 1987)); *see also Campbell*, 434 F.3d at 1314. The Court now turns to Count VI.

Count VI alleges the "City's zoning code, on its face, treats similarly situated persons disparately." (Am. Compl. ¶ 136). Chabad alleges the "City's zoning code prohibits religious assembly use in the business districts, however the City's code allows other uses which are similarly situated to Chabad." (*Id.* ¶ 137).

The parties disagree regarding what level of scrutiny should be applied to evaluate the COO

CASE NO. 07-60738-CIV-ALTONAGA/Brown

with respect to the Business Districts.  To resolve this dispute, it is necessary to determine the bases of the ordinance's classification.  The City argues that because other uses, namely secular community assemblies as defined by the COO, were restricted from entering the Business Districts as well, the exclusion of religious assemblies was not explicitly based upon religion.  (*See* City Mem. at 11; City Resp. at 12).  Therefore, the City proposes that rational basis apply.

However, "the fact that the legislation also burdens members of the unprotected classes is irrelevant." *Love Church v. City of Evanston*, 671 F. Supp. 515, 518 (N.D. Ill. 1987).  The City created a separate and distinct category for purposes of zoning religious assemblies.  *See* COO § 21-8.  That other, secular assemblies were excluded might be persuasive if all land uses that were similarly situated to religious assemblies were similarly limited.  *Love Church*, 671 F. Supp. at 519.

Chabad has identified a number of uses permitted in the Business Districts which it alleges are similarly situated to religious assemblies, including various types of schools permitted under the category of "Personal Improvement Centers" such as art, dance, drama, music, martial arts, and handicraft or hobby instruction.  (*See* COO § 21-8; Chabad Mot. at 11; Chabad Resp. at 9-11).  Chabad asserts that these uses are all places where people gather and all provide education and skill development.  (*See* Chabad Mot. at 12; Chabad Resp. at 9-11).  Chabad presents the deposition testimony of several City officials who admit that such uses are similar and are apparently unable to articulate any meaningful difference between those uses and religious assemblies.  (*See* Chabad Resp. at 9-10; App. to Chabad Mot., Ex. 11, Christopher Farrell Depo. [D.E. 81-12] at 119, 122; Wood Depo. at 168; App. to Chabad Resp., Ex. 2, Debby Eisinger Depo. [D.E. 90-3] at 160-163; Ex. 3, Susan Bernard Depo. [D.E. 90-4] at 268).

The City itself fails to identify any relevant way in which religious assemblies differ from the

20

uses permitted in the Business Districts.  First, the City relies on the definitions contained in its zoning code, which do not control the Court's evaluation and which do nothing to explain how the differences relate to the stated purpose of the distinction.  Second, the City asserts the various permitted uses somehow differ without providing meaningful explanation.  The only specific difference the City identifies is the fact that day care centers are licensed by the state whereas religious assemblies are not (*see* City Resp. at 13-14), but the City fails to explain why this particular difference is relevant to the City's interests.[11]  The undersigned therefore finds that similarly situated uses are treated more permissively than religious assemblies, the COO distinguishes on the basis of religion, and strict scrutiny applies.

This discussion is closely tied to the evaluation of the City's justification for the exclusion of religious assemblies from the Business Districts.  The City proposes that the basis for the distinction is contained in the text of the ordinance itself: Business Districts were established "to provide for the local neighborhood shopping and personal service needs of a limited surrounding residential area."  COO § 21-08.  The City claims religious assembly uses would not further these goals, but fails to offer any factual evidence to buttress this assertion.  Further, the City fails to explain why a religious assembly does not contribute to the "personal service needs" of the residents of Cooper City in the same or similar way that classes at the numerous permitted secular uses would.

Finally, several uses which do not appear to provide for the commercial needs of the residents are nonetheless permitted in the Business Districts, including sewage lift or pumping station,

---

[11] At oral argument, the City acknowledged that "assemblies" as defined in the COO, religious or secular, are similarly not-for-profit, whereas the permitted uses are generally commercial entities.  However, the absence of a "commercial exchange" does not threaten any compelling interest of the City.  *See Love Church*, 671 F. Supp. at 519 (declining to recognize commercial/noncommercial distinction as a relevant difference between churches and other entities permitted to enter zoning district).

transformer substation, and water or wastewater plant, a charge to which the City has failed to respond.  *See* COO § 23-46(c).  Not only has the City failed to demonstrate why its alleged justification is compelling, but even if the Court assumes it is compelling that a municipality provide for the shopping and "personal service needs" of its residents, the COO is not narrowly tailored to achieve this goal.  Therefore, the prohibition of religious assembly in the Business Districts violates the Equal Protection Clause, and Chabad is entitled to summary judgment as to Count VI.[12]

> 2.    *Municipal Liability*

Count VIII of the Amended Complaint, entitled "Municipal Liability for City Policy," alleges, *inter alia*, the "City's zoning code, adopted by the City Commission while acting in its capacity as a legislative body of the City, constitutes an official policy of the City" (Am. Compl. ¶ 167), and the "single decision of the City Commission in adopting the City's zoning code which prohibits religious assembly in the business districts deprived Chabad of its rights of freedom of religion and freedom of assembly under the First Amendment," (Am. Compl. ¶ 172).[13]  Fairly read, Count VIII alleges that the City may be held liable for the alleged violations asserted in Chabad's various section 1983 claims on the theory of municipal liability pursuant to *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 691 (1978).  The City admits the adoption of the present zoning ordinances constitutes an official policy of Cooper City.  (*See* City Mot. ¶ 5(d)).  Indeed, the City does not dispute that it sanctions the COO,

---

[12]   Because the Court has determined that the COO's prohibition of religious assembly in the Business Districts is facially unconstitutional, Chabad's claim in Count VII that the provisions are also unconstitutional as applied is rendered moot.  *See Café Erotica of Fla., Inc. v. St. Johns County*, 360 F.3d 1274, 1293 (11th Cir. 2004); *Weaver v. Bonner*, 309 F.3d 1312, 1318 n.9 (11th Cir. 2002).

[13]   As the City has not formally challenged the second "act" that Chabad alleges violates its rights  –  the failure of the City to amend the Code when notified of constitutional deficiencies (*see* Am. Compl. ¶¶ 168, 173)  –  the Court will not consider the application of *Monell* to this act.

CASE NO. 07-60738-CIV-ALTONAGA/Brown

the City Commission that adopted the COO has final policy-making authority, and the COO was applied to Chabad by City officials responsible for making such policy. *See Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637 (11th Cir. 1991) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480-83 & n.12 (1986)) Therefore, to the extent that the COO is constitutionally deficient as urged in Counts VI, VII, IX, X and XI, *Monell* liability attaches. Although Count VIII does not stand as an independent cause of action separate and apart from the section 1983 claims, neither is the City entitled to summary judgment as to Count VIII.

    3.    *Freedom of Speech*

Count IX of the Amended Complaint alleges, *inter alia*, that the "prohibition of religious assembly within the business district constitutes a violation of Chabad's First Amendment rights of freedom of speech and freedom of assembly." (Am. Compl. ¶ 180). The City's Motion, however, only addresses case law applicable to freedom of speech and consequently the Court only addresses this portion of the claim.

A municipality may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). The principal inquiry in determining whether a regulation is content neutral is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."

23

CASE NO. 07-60738-CIV-ALTONAGA/Brown

*Id.*

The City proposes that the justification for its prohibition on religious assemblies in the Business Districts can be found in the text of the COO itself, namely, "to meet the local neighborhood shopping and personal service needs of a limited surrounding residential area." (COO § 23-46(a); *see also* City Mem. at 15). As further evidence of this intent, the City points out that both secular and religious "assemblies" are prohibited from locating in the Business Districts, but that religious assemblies are not entirely excluded from the City. (*See* City Mem. at 15; Reply in Support of City Mot. [D.E. 105] at 9). As the restriction is justified without reference to the content of the speech of the religious assemblies, it is content neutral and subject to intermediate scrutiny. *See, e.g.*, *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 46 (1986) (zoning ordinance prohibiting adult theaters from locating in certain areas of city held content neutral where justification was to limit secondary effects on the surrounding community); *Ward*, 491 U.S. at 792 (regulation of volume of amplified music at bandshell held content neutral where justification was to avoid undue intrusion on residential and park areas); *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 468 (8th Cir. 1991) (zoning ordinance excluding churches from business district held content neutral where justification was preserving economic vitality of central business district).

Although a time, place and manner regulation need not be the least-restrictive means of accomplishing the City's stated objective, it "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. The City bears the burden of producing some factual support for its assertion that the exclusion of religious assembly advances its goal of providing for the commercial needs of its residents. *Compare City of Renton*, 475 U.S. at 50-51 (evidence of reliance on experiences of and studies by

24

CASE NO. 07-60738-CIV-ALTONAGA/Brown

other cities in crafting zoning ordinance sufficient evidentiary basis), *with Cornerstone Bible Church*, 948 F.2d at 469 (insufficient factual support where city produced only conclusory affidavits stating churches would displace potential commercial uses and increase potential for traffic, parking and land-use conflicts; city failed to conduct any studies on the impact of churches on commercial activity).  While the City has asserted a content-neutral justification for the exclusion of religious assemblies from the Business Districts, it has failed to submit any evidence demonstrating how the prohibition of religious assemblies actually advances the asserted goals.  The City has performed no studies nor provided any factual predicate for its assertion that the location of religious assemblies in the Business Districts would interfere with the provision of shopping and personal services.  The City's Motion is thus denied as to Count IX.

> 4.      *Free Exercise of Religion*

Count X of the Amended Complaint alleges that the "prohibition of religious assembly within the business districts constitutes a violation of Chabad's . . . First Amendment rights of free exercise."[14] (Am. Compl. ¶ 195).  Chabad essentially alleges that all of the City's zoning ordinances, including those that apply to the Business Districts, act to improperly burden its right to free exercise of religion provided by the First Amendment to the Constitution ("Free Exercise Clause").  U.S. CONST. amend. I.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

---

[14] Chabad does not have standing to seek relief for others who might be impacted by the COO, namely "other religious assemblies' [sic] who were and are still unable to locate within the City."  (Am. Compl.¶ 195; s*ee also* Oct. 15, 2007 Order at 13).

25

CASE NO. 07-60738-CIV-ALTONAGA/Brown

The right of free exercise does not relieve an individual of the obligation to comply with a law of neutral and general applicability even where it has the incidental effect of burdening religious practice. *See Lukumi*, 508 U.S. at 531; *Employment Div., Dept. of Human Res. of Oregon v. Smith*, 494 U.S. 892, 879 (1990). "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is likely an indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533. At minimum, the law must not discriminate on its face. *Id.* Even if a law is facially neutral, the Court must evaluate whether the law is neutral in operation. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* at 534. Where the law is not neutral and generally applicable, it must be justified by a compelling government interest and must be narrowly tailored to advance that interest. *Id.* at 531-32.

"A zoning law is not neutral or generally applicable if it treats similarly situated secular and religious assemblies differently because such unequal treatment indicates the ordinance improperly targets the religious character of an assembly." *Midrash Sephardi*, 366 F.3d at 1232 (holding RLUIPA's equal terms provision codifies the Supreme Court's *Smith-Lukumi* line of precedent with respect to the Free Exercise Clause). While the mere mention of church or synagogue in a zoning code does not destroy the code's neutrality, a court must "be mindful of the potential for impermissible 'religious gerrymanders,' which may render a zoning code operatively non-neutral." *Id*. at 1232-33.

Chabad's free exercise claim is analogous to the claim in Count III, as the latter relies on the statutory codification of the Free Exercise Clause. In this case, the COO is not neutral and generally

applicable with respect to the exclusion of religious assemblies from the Business Districts. The City contends the distinction is intended to preserve the Business Districts as venues to serve the shopping and personal service needs of the local residents, and therefore the exclusion is not based upon religion, *per se*. The City also relies on the fact that other types of non-commercial community assemblies are excluded from the Business Districts. However, the undersigned has previously determined that uses providing services similar to religious assemblies are permitted in the Business Districts (*see* Jan. 16, 2008 Order), religious assemblies have been targeted and the ordinance is not neutral. The exclusion of religious assemblies from the Business Districts is subject to strict scrutiny, and as already determined, *supra*., the COO does not survive. Therefore, the City is not entitled to summary judgment with respect to Count X.

5.      *Hybrid Rights Claim*

Chabad urges the Court to recognize a "hybrid rights claim," which alters the analysis of an otherwise deficient free exercise claim. In *Smith*, Justice Scalia analyzed cases in which the Court found that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action and determined that such claims only succeeded where they involved some other constitutional violation in addition to the free exercise claim. 494 U.S. at 881. Some courts have interpreted this language as announcing the parameters of a "hybrid" free exercise claim, subjecting the generally applicable law to strict scrutiny to resurrecting an otherwise deficient claim. *See, e.g.*, *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961, 988-89 (N.D. Ill. 2003). Other courts have called the language dictum and refused to expand the analysis of the free exercise claim. *See Warner v. City of Boca Raton*, 64 F. Supp. 2d 1272, 1288 n.12 (S.D. Fla. 1999); *Midrash Sephardi v. Town of Surfside*, No. 99-1566-CIV, 2000 WL 35633163, at *14

CASE NO. 07-60738-CIV-ALTONAGA/Brown

(S.D. Fla. July 31, 2000).  Indeed, Justice Scalia noted that the circumstances of *Smith* did not

present such a "hybrid" situation and did not proceed to analyze the case as such.  494 U.S. at 882.

The Eleventh Circuit has not recognized the existence of such a hybrid claim, and the

undersigned joins in the skepticism other courts in the Southern District of Florida have expressed.

*See Warner*, 64 F. Supp. 2d at 1288 n.12; *Midrash Sephardi*, 2000 WL 35633163, at \*14; *see also*

*Lukumi*, 508 U.S. at 567 ("If a hybrid claim is simply one in which another constitutional right is

implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule.")

(Souter, J., concurring); *Kissinger v. Bd. of Trustees of Ohio State Univ., College of Veterinary*

*Medicine*, 5 F.3d 177, 180 (6th Cir. 1993) ("We do not see how a state regulation would violate the

Free Exercise Clause if it implicates other constitutional rights but would not violate the free Exercise

Clause if it did not implicate other constitutional rights.").  Accordingly, the City is entitled to

summary judgment with respect to Count XI.

## IV.  CONCLUSION

Consistent with the foregoing analysis, it is

**ORDERED AND ADJUDGED** that Chabad of Nova, Inc.'s Motion for Partial Summary

Judgment **[D.E. 79]** and Defendant, City of Cooper City's Amended Motion for Partial Summary

Judgment **[D.E. 75]** are **GRANTED-IN-PART** and **DENIED-IN-PART**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28th day of July, 2008.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: Hon. Stephen T. Brown; counsel of record

28